[No. F045480. Fifth Dist. Feb. 7, 2006.]

JOHN DOE, Plaintiff and Appellant, v.
BAKERSFIELD CITY SCHOOL DISTRICT, Defendant and Respondent.

558

**COUNSEL**

Law Offices of Ralph B. Wegis and Ralph B. Wegis for Plaintiff and Appellant.

Clifford & Brown, Arnold J. Anchordoquy and Christopher J. Hagan for Defendant and Respondent.

**OPINION**

**WISEMAN, J.**—John Doe (plaintiff) appeals an order denying his petition, brought under Government Code section 946.6,[1] in which he sought leave to file a late tort claim against the Bakersfield City School District (the District) based on allegations of continuous sexual abuse by his former junior high school guidance counselor. According to the evidence plaintiff presented in support of his petition, the sexual abuse began in 1993, when plaintiff was 13 years old, continued through plaintiff's high school years, and did not end until 2000 or 2001, when plaintiff was 19 or 20 years old. Throughout this seven-to-eight-year period, the counselor made ongoing threats to publicly humiliate plaintiff if he ever disclosed the molestation.

In support of his petition, plaintiff argued the District should be equitably estopped from asserting his noncompliance with the claims-presentation requirements as a defense. He based his argument on evidence that the counselor's threats deterred him from filing a timely government tort claim and that the deterrent effect of the threats was still operating on him until shortly before he filed his section 946.6 petition. In denying plaintiff's petition, the trial court found that the evidence presented at the hearing did not support application of the doctrine of equitable estoppel beyond any of the following: (1) plaintiff's departure from the District to begin high school in another school district; (2) plaintiff's becoming an adult; (3) plaintiff's graduation from high school; or (4) plaintiff's termination of his relationship with the guidance counselor.

We conclude that, under the unique circumstances of this case, the trial court abused its discretion in denying plaintiff's petition. In short, plaintiff presented uncontradicted evidence of circumstances giving rise to estoppel which occurred *after* the events identified in the trial court's ruling. Further, there is no legal basis for concluding that estoppel would be cut off at any of the four points mentioned in the court's order. Although the leading cases defining the relevant test for estoppel involved minor petitioners, nothing in those cases suggests that an adult victim of sexual abuse, which began when the victim was a minor and continued into adulthood, is precluded from raising the doctrine of equitable estoppel in a lawsuit against a public entity. We reverse the trial court's order and direct the court to grant plaintiff's petition for relief from the claims presentation requirements of the California Tort Claims Act.

---

[1] Further statutory references are to the Government Code.

## *FACTUAL AND PROCEDURAL HISTORIES*

On July 18, 2002, when he was 22 years old, plaintiff filed a government tort claim against the District pursuant to sections 905, 910, and 945.4. At the same time, he filed an application pursuant to section 911.4 for leave to present his claim late (i.e., more than six months after the accrual of his cause of action). The District denied the late-claim application and rejected the claim as untimely. Plaintiff then filed a petition pursuant to section 946.6 for relief from the District's denial of the late-claim application.

Plaintiff submitted declarations in support of the petition and presented live testimony at the hearing. Because the events and circumstances underlying plaintiff's claim are fairly detailed, we set out the facts according to three main periods of events: plaintiff's junior high school, high school, and post-high-school years. The following facts are taken primarily from the declarations and hearing testimony of plaintiff and plaintiff's girlfriend, A.

*Junior High School (1992–1994)*

Plaintiff was born in April 1980. He met Salvadore Diaz, Jr. (Diaz), when he was in the sixth grade. Diaz was a guidance counselor at the junior high school plaintiff began attending the following year. During plaintiff's seventh-grade year, Diaz spent time befriending plaintiff and inquiring into plaintiff's family life. Plaintiff explained to Diaz that his father was disabled and was in and out of the hospital and that his family was struggling financially since his stepmother was the only one working. Diaz told plaintiff if he ever needed to talk or get help with anything, plaintiff could come to him because, as the guidance counselor, that was his job.

Plaintiff started to run into Diaz more often at school. It seemed like Diaz always happened to be where plaintiff was and continuously tried to talk to him. Diaz, who also managed the snack bar, asked plaintiff to work there with him. Because plaintiff was supposed to be in class, Diaz would give plaintiff a pass to return to class and excuse his absence or tardiness. Diaz also had plaintiff join the spirit team, which Diaz coached. Team practices were after school. Diaz offered plaintiff rides home so he would not have to walk. Soon Diaz started asking plaintiff more personal questions relating to girlfriends and sex. Plaintiff thought he could confide in Diaz about anything because he was the school counselor.

Diaz sexually molested plaintiff for the first time toward the end of plaintiff's seventh grade year, around June 1993. Diaz arranged a slumber party at his house, inviting over plaintiff and other members of the spirit team. Diaz gave the students alcohol to drink and put on pornographic

movies for them to watch. In the early morning hours, plaintiff woke up to find Diaz pulling down his shorts. Plaintiff pretended to be asleep so Diaz would go away. When Diaz did not leave, plaintiff whispered, "what are you doing?" Diaz told plaintiff to be quiet or he would wake up his friend. Diaz then forced oral sex on plaintiff. Plaintiff was so scared he just laid there and did nothing and felt "dirty" afterward. The next morning, when Diaz drove plaintiff home, Diaz told plaintiff he was "not allowed to tell anyone what had happened" and plaintiff would "get in trouble" if he did. When plaintiff went to school the following Monday, Diaz acted like nothing had happened. Plaintiff felt he would be safe if he said nothing and acted like nothing had happened.

A few weeks later, plaintiff went into Diaz's office to see him for counseling regarding an unrelated incident of sexual abuse. Plaintiff was afraid to tell his parents and felt Diaz was the only person with whom he could talk. Diaz told plaintiff he was required by law to tell plaintiff's parents. Plaintiff begged him not to do so. Diaz said the only way he would make an exception was if he could continue performing oral sex on plaintiff. Plaintiff felt he had no choice. Diaz continued to molest plaintiff on a weekly basis for the remainder of the school year. Diaz would drive plaintiff home after school and pull into vacant parking lots. Whenever plaintiff resisted, Diaz would tell him he would not take him home unless he allowed Diaz to perform oral sex on him.

The molestation continued into the summer. Diaz knew plaintiff played sports and began to show up at his games. Diaz asked plaintiff's parents if he could take plaintiff out for dinner after the games. On the way home, Diaz would stop at his house or pull into a parking lot and force oral sex on plaintiff.

Diaz molested plaintiff throughout his eighth grade year both on and off campus. During plaintiff's lunch break, Diaz would take plaintiff out to lunch and molest him in the car on the way back to school, or he would take plaintiff back to his house and molest him there. Diaz would also take plaintiff out of class, giving him a pass so plaintiff could go with Diaz on Diaz's lunch break. Plaintiff thought there was nothing he could do to stop Diaz and felt he was not safe anywhere. Diaz began pressuring plaintiff to do more sexual things with him, telling him he would get into trouble if he did not.

Throughout this time, Diaz made threats in connection with the molestation. When plaintiff resisted, Diaz would threaten plaintiff, saying things such as, "You know what is at stake," "I am not the one who is going to get in trouble," and "No one is going to believe you." Plaintiff was always

worried about his friends finding out and people making fun of him. Other children would often notice how much time Diaz was spending with plaintiff and would say plaintiff was Diaz's "pet." Diaz would tell plaintiff over and over that he was the one who made plaintiff popular and, without him, plaintiff would be nothing. When plaintiff tried to avoid Diaz, Diaz would tell plaintiff he could find out anything about plaintiff that he wanted. Plaintiff believed Diaz because he always seemed to know what plaintiff was doing even when plaintiff did not tell him. Plaintiff declared that Diaz repeatedly said, "if he got in trouble, he would tell on me and all the kids would make fun of me as if it was my fault."

*High School (1994–1998)*

Diaz continued to pursue plaintiff after plaintiff changed schools to begin high school in another school district. Diaz would go to plaintiff's parents behind his back and get their permission to pick plaintiff up from school or other after-school activities. Diaz would attend plaintiff's wrestling matches and baseball games. Because plaintiff's father was ill and could not stay for the entire game, Diaz would offer to take plaintiff home and then sexually assault him on the way.

Even though Diaz worked at a different school, Diaz found ways to "track [plaintiff] down" when plaintiff tried to avoid him. Diaz became friends with the "attendance lady" at plaintiff's high school and would call the school and have messages sent to plaintiff there. If plaintiff was not responsive, when Diaz was able to get hold of plaintiff, he would threaten to hurt plaintiff's reputation by telling people plaintiff was gay. Plaintiff was afraid of what Diaz would do. Diaz always told plaintiff he knew a lot of people. Diaz would get people to come up to plaintiff and say things like, "Sal is looking for you," "Sal is mad at you," "You don't want Sal mad at you," and "Sal needs to talk with you because he is not happy." Diaz would often accuse plaintiff of trying to hide from him. When plaintiff told him he did not want to have sexual activities forced on him anymore, Diaz threatened plaintiff that if he "quit on him," he "would regret it." Diaz told plaintiff he would ruin plaintiff's reputation and he knew "people in high places" who could "take [plaintiff] down."

When plaintiff turned 16 years old and started driving, the sexual assaults occurred less frequently because Diaz did not have the excuse of driving plaintiff. However, Diaz would still show up at plaintiff's wrestling matches and want to take plaintiff out to dinner. If plaintiff did not want to go, Diaz would threaten him. Diaz had nicknames for plaintiff, including "Fluffy," which he would call out in front of other people at plaintiff's baseball games.

Diaz got plaintiff's friends to call him "Fluffy" as well. Plaintiff felt no one would believe his side of the story if he told and that he had to do what Diaz wanted.

*Post High School (1998–2002)*

When he was 18 years old, plaintiff moved out on his own and started attending college. Diaz called plaintiff frequently, leaving messages asking why plaintiff had not called and making statements such as, "You need to call me right way," "It's very important that you call me," and "You don't want anything to happen to you." Plaintiff felt he had no other choice but to call Diaz back.

Diaz tried to find out from other people where plaintiff was and what he was doing. He discovered where plaintiff lived and started showing up at his apartment. Diaz told plaintiff that unless he wanted his roommate to know what was going on, plaintiff better let him in. Diaz became friends with plaintiff's roommate and began showing up at the apartment when plaintiff was out and would be waiting for plaintiff when he got home. He even convinced plaintiff's roommate to let him clean the apartment for $15 per week. The sexual assaults started happening more often because Diaz had access to plaintiff again. He knew the schedule of plaintiff's roommate and would show up when the roommate was gone and threaten plaintiff if he did not do what he wanted sexually. Diaz threatened to ruin plaintiff's "wrestling career" and "everything that [plaintiff] was working for."

According to plaintiff's declaration, the last sexual encounter between Diaz and plaintiff took place in early 2000, shortly before plaintiff's 20th birthday. At the hearing, plaintiff testified that he believed the last encounter was in March 2001. A sheriff's department detective, Brian Armendariz, testified that plaintiff said the last sexual encounter took place in late 1999.

After the last sexual encounter, whenever it occurred, Diaz never stopped calling and threatening plaintiff. He would say things like, "You don't want me to start any trouble, do you?" Plaintiff would avoid answering his telephone, or if he did answer, plaintiff would tell Diaz he did not want to see him. Plaintiff testified that, between the time he ended the relationship and August 2001, he spoke with Diaz at least once or twice a month but Diaz was "always calling [plaintiff's] cell phone and leaving messages." Plaintiff began to make it a point not to return all of Diaz's calls.

In November or December of 2001, plaintiff disclosed the molestation for the first time to his girlfriend, A. A. testified regarding the circumstances of the disclosure. A. and plaintiff had been arguing, when A. said something

plaintiff had done was as hurtful as a sexual assault and that he could never understand because, unlike her, he had never been sexually assaulted. Plaintiff replied that he did understand. A. asked plaintiff if he had been molested. She described his reaction:

"He said, 'I can't—I can't talk about this.' And he started crying hysterically. By this time we were driving, and I—he was hysterically crying to the point I said, 'You have to pull over because I'm scared for my safety with you.'

"Obviously he couldn't see. So he pulled over into a parking lot. He didn't even get out and walk around the car to get in the back seat. He had a Yukon, and he just crawled through the middle of the seat, and I got into the driver's seat . . . . And he curled up in the back seat of his car in a fetal position with a shirt and just started screaming and crying at the top of his lungs, 'I can't tell. I'm not going to tell. I'll be hurt if I tell. I promise I'll never tell. I'm going to take this to my grave.'

"I said, 'Who was he?'

"He said, 'He'll hurt me. I can't tell.' [¶] . . . [¶]

". . . We went back to [plaintiff's] house, and I had to, like, basically help him in the house.

"When he got into his bedroom I said, 'You have to tell me who this was,' and he said 'I told you I can't tell. He'll hurt me. I told you I was going to take this to my grave.'

"And he was crying so hysterically that he started gagging."

After three or four hours, plaintiff finally revealed Diaz's name. When A. suggested contacting the police, plaintiff "became more hysterical," said Diaz "had people [in] high places that would come get him," and threatened to kill himself.

After plaintiff told A. about the abuse, she "conned" Diaz's telephone number from plaintiff. A few days later, A. called Diaz and said she knew what was going on:

"And he said, 'You don't know what I do.'

"And I said, 'Yes, I do,' and I named five boys including [plaintiff's] name, but I added all five of the guys['] names in there because I didn't want it to just be [plaintiff] for [plaintiff's] safety because he was scared."

After A.'s call, Diaz contacted plaintiff and said he wanted to see him. A. called Diaz again and told him to stay away from plaintiff. Diaz replied, "You better watch out because he doesn't know what he's doing. I'll get him. This is going to ruin him if it's going to ruin me."

As a result of A.'s actions, Diaz came to the attention of law enforcement. Detective Armendariz testified that in November 2001, a school principal contacted the sheriff's department to report that after A. confronted Diaz, Diaz confessed to abusing students. As part of his investigation, the detective contacted plaintiff on January 31, 2002.

In February 2002, A. and plaintiff were driving by Diaz's sister's house when they spotted Diaz outside unloading groceries. A. rolled down the window and yelled, "You can't face the truth; you want to hide from it!" Diaz yelled back at plaintiff, who was in the passenger seat of the car, "I can't believe you're doing this to me! You're going to be very sorry! You should have kept your mouth shut!"

Plaintiff testified that after he gave the detective his statement, he was enrolled in a witness protection program and was referred to psychotherapist Joan Knowlden. Plaintiff met with Knowlden on July 8, 2002, which was the first date she had available to meet with him. Plaintiff testified that the counseling sessions with Knowlden helped allay the fears that had deterred him from taking legal action earlier. After receiving help from Knowlden, he took steps to get legal advice and followed the advice of his attorney.

In his declaration, plaintiff stated that it was not until the sheriff's department contacted him indicating Diaz was under investigation for pedophilia and he was entered into a local victim/witness protection program and had his first counseling session that, for the first time in over eight years, he believed Diaz would not be able to follow through with his threats.

The only evidence the District presented in opposition to the petition was the testimony of Detective Armendariz. Armendariz testified that plaintiff never told him during any of their meetings that he was "physically afraid" Diaz would harm him or would direct someone else to harm him. On cross-examination, the detective explained that the statute of limitations for criminal charges had not expired, so he never considered or investigated the issue of the timeliness of plaintiff's coming forward. On redirect, Armendariz acknowledged that in the past he has encountered individuals who have communicated to him they were fearful of the people who had molested them, but in his meeting with plaintiff, he did not see anything to conclude that plaintiff was afraid of Diaz.

At the time of the hearing, Diaz remained at large and a warrant for his arrest was outstanding. After the hearing, the trial court issued a minute order denying relief. The order reads as follows:"Petition denied. [¶] The evidence presented at the hearing conducted 1/20/04 does not support invoking the doctrine of equitable estoppel to the respondent's assertion of the late claim limitations beyond petitioner's departure from the Bakersfield City School District, or becoming an adult, or graduating from high school, or termination of [the] relationship with Diaz."

Plaintiff's subsequent request for a statement of decision was denied as untimely.

## *DISCUSSION*

### I.  *Standard of review*

■ We review the trial court's refusal to grant relief under section 946.6 for abuse of discretion. (*Ebersol v. Cowan* (1983) 35 Cal.3d 427, 435 [197 Cal.Rptr. 601, 673 P.2d 271].) "Abuse of discretion is shown where uncontradicted evidence or affidavits of the petitioner establish adequate cause for relief. [Citation.]" (*Ibid.*) "Section 946.6 is a remedial statute intended 'to provide relief from technical rules that otherwise provide a trap for the unwary claimant.' [Citations.] As such, it is construed in favor of relief whenever possible. [Citation.]" (*Bettencourt v. Los Rios Community College Dist.* (1986) 42 Cal.3d 270, 275 [228 Cal.Rptr. 190, 721 P.2d 71] (*Bettencourt*); see also *Viles v. State of California* (1967) 66 Cal.2d 24, 28–29 [56 Cal.Rptr. 666, 423 P.2d 818] (*Viles*).) "[A] trial court decision denying relief will be scrutinized more carefully than an order granting relief. [Citation.]" (*Bettencourt, supra,* 42 Cal.3d at p. 276; see *Viles, supra,* 66 Cal.2d at p. 29.)

### II.  *California Tort Claims Act and Doctrine of Equitable Estoppel*

■ Under the Tort Claims Act, a person may not sue a public entity for personal injury or wrongful death unless he or she first presented a written claim to the public entity within six months following the accrual of the claim and the public entity rejected the claim. (§§ 911.2, 945.4; *Munoz v. State of California* (1995) 33 Cal.App.4th 1767, 1776 [39 Cal.Rptr.2d 860] (*Munoz*).) If a claim is presented late, the public entity, within a prescribed time, may send the claimant written notice that the claim is being returned without action due to its untimely presentation. In that instance, the claimant's only recourse is to apply for leave to present a late claim. (§ 911.3, subd. (a).)

■ A claimant has a period of one year from the accrual of the claim to present a written application to the public entity for leave to file a late claim.

(§§ 911.4, 911.6.)[2] If the public entity denies leave to present a late claim, the claimant can petition the court under section 946.6 for an order relieving him or her of the requirement of presenting a claim. The court must relieve the petitioner from presentation and claim requirements if it finds the claimant's application under section 911.4 was made within a reasonable time, was denied or deemed denied under section 911.6, and the "failure to present the claim was through mistake, inadvertence, surprise, or excusable neglect unless the public entity establishes that it would be prejudiced in the defense of the claim if the court relieves the petitioner from the requirements of Section 945.4." (§ 946.6, subd. (c)(1).) In determining whether relief is warranted, the court will consider the petition, any supporting or opposing affidavits, and any other evidence presented at the hearing. (§ 946.6, subd. (e); *Bettencourt, supra,* 42 Cal.3d at p. 275; *Munoz, supra,* 33 Cal.App.4th at p. 1778.)

█ Notwithstanding these rules, "[i]t is well settled that a public entity may be estopped from asserting the limitations of the claims statute where its agents or employees have prevented or deterred the filing of a timely claim by some affirmative act. [Citations.] Estoppel most commonly results from misleading statements about the need for or advisability of a claim; actual fraud or the intent to mislead is not essential. [Citation.] A fortiori, estoppel may certainly be invoked when there are acts of *violence* or *intimidation* that are *intended* to prevent the filing of a claim. [Citations.]" (*John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 445 [256 Cal.Rptr. 766, 769 P.2d 948].)

In *John R.,* a child molestation case involving a public school teacher, the Supreme Court held the doctrine of equitable estoppel could be applied against the school district if the fact finder determined the teacher's threats prevented the student from pursuing his claim within the statutory period. (*John R. v. Oakland Unified School Dist., supra,* 48 Cal.3d at p. 446.) The facts of *John R.* are as follows: The 14-year-old victim was a student in the ninth grade when his mathematics teacher asked him to participate in a school-sanctioned work-experience program where students received academic credit and monetary payments for assisting teachers with tasks such as helping to correct other students' papers. (*Id.* at pp. 441–442.) Students had the option of performing the required work at teachers' homes. The teacher in *John R.* had the victim come to his apartment for that purpose. Over the course of numerous sessions, the teacher attempted to develop a close relationship with the student and eventually tried to seduce him. The teacher tried to

---

[2] A civil cause of action for child molestation generally accrues at the time of the molestation. (*DeRose v. Carswell* (1987) 196 Cal.App.3d 1011, 1017 [242 Cal.Rptr. 368].) Plaintiff does not argue that he filed his late-claim application within one year of the last time he was molested. The only question, therefore, is whether the District should be equitably estopped from asserting untimely claim presentation as a defense.

persuade the student that "engaging in sex acts with him would be a constructive part of their relationship and, at times, threatened to give John failing grades if [he] would not go along with his desires and said he would tell people that John had solicited sex from *him*." (*Id.* at p. 442.) On one occasion in February 1981, the teacher pressured the student into engaging in acts of oral copulation and anal intercourse. The student told the teacher he would report the incidents to his parents. The teacher threatened to retaliate against the student if he revealed what had taken place. As a result of the threats, and his embarrassment and shame at what had happened, the student did not disclose the incidents to his parents until December 1981. His parents subsequently reported the incidents to the school district and the police. (*Ibid.*) The student presented his late-claim application to the school district in May 1982, 15 months after the assault. (*Id.* at p. 444.)

The Court of Appeal concluded that the student's late-claim application was timely within the one-year period of section 911.4 because, under the " 'delayed discovery' doctrine," his cause of action did not accrue until he told his parents about the incident in December 1981. (*John R. v. Oakland Unified School Dist.*, *supra*, 48 Cal.3d at p. 444.) Upon review, the Supreme Court expressed doubt about whether the delayed discovery theory applied to these facts but opined the circumstances could demonstrate the claim was timely filed under a theory of equitable estoppel. (*Ibid.*) The court reasoned:

"Although the teacher's alleged threats in this case were no doubt motivated largely by self-interest, rather than to prevent John from filing a claim against the district, it would clearly be inconsistent with the equitable underpinnings of the estoppel doctrine to permit the district to benefit to plaintiffs' detriment by such threats. [Citation.] Putting aside for the moment the substantive question whether the district may be held vicariously liable for the teacher's alleged molestation of John, we have no hesitation in concluding that the teacher's threats may be taken into account in resolving the procedural status of plaintiffs' claims against the district. . . . Assuming plaintiffs can establish their case, it would plainly be inequitable to permit the district to escape liability only because the teacher's threats succeeded in preventing his victim from disclosing the molestation until the time for filing a claim against the district had elapsed. We conclude that, for purposes of applying equitable estoppel, the time for filing a claim against the district was tolled during the period that the teacher's threats prevented plaintiffs from pursuing their claims." (*John R. v. Oakland Unified School Dist.*, *supra*, 48 Cal.3d at pp. 445–446, fn. omitted.)

The court held that the question of whether the District was estopped from asserting as a defense the plaintiffs' failure to comply with the claims-presentation statutes was a question of fact for the trial court: "Because the

trial court did not analyze the timeliness of plaintiffs' claims in this light, it made no findings on any of the factual issues relevant to the equitable estoppel doctrine. It did not determine (1) whether any threats were in fact made by the teacher, (2) when the effect of any such threats ceased, or (3) whether plaintiffs acted within a reasonable time after the coercive effect of the threats had ended. [Citations.] In the absence of an adverse finding on any of these points, it was error to have granted a nonsuit in favor of the district on the timeliness question; on remand, the trial court must resolve these matters to determine whether the action may go forward." (*John R. v. Oakland Unified School Dist.*, *supra*, 48 Cal.3d at p. 446, fn. omitted.) The court directed that, in determining when the estoppel ceased to operate, "the trial court must take into account the nature of the conduct on which the estoppel is based conduct that here lacks a clear ending point, particularly in light of the allegations that the teacher's threats against John continued even after the boy had told his parents of the molestation and the incidents had been reported to the district and the police." (*John R. v. Oakland Unified School Dist.*, *supra*, 48 Cal.3d at p. 446, fn. 6.)

In *Christopher P. v. Mojave Unified School Dist.* (1993) 19 Cal.App.4th 165 [23 Cal.Rptr.2d 353], we applied *John R.* to the case of an 11-year-old student who was molested by a teacher. The teacher told the student " 'not to tell anyone because "it was not supposed to happen." ' " (*Christopher P. v. Mojave Unified School Dist.*, *supra,* at p. 168.) As a result, the student waited over six months to report the abuse. Two years later, the teacher pled guilty to a molestation charge. Under a mistaken impression that the student would receive restitution through the criminal proceedings, his parents did not retain counsel and present a claim to the school district until after that time. A claim and a late-claim application were finally presented about two years and six months after the molestation. The school district rejected them as untimely, and the trial court denied a petition for relief from the district's decision. (*Ibid.*) The trial court based its ruling on the fact that the molester did not make a threat but only told the victim not to tell. (*Id.* at pp. 171–172.)

On appeal, we held that the trial court applied too narrow an understanding of the principles of estoppel, reasoning:

"The alleged affirmative act which delayed the filing of a timely claim in this case is a directive not to report the incident because it was not supposed to happen, made immediately after the molest. While a simple directive 'not to tell' is distinguishable from the continuing threats of harm should the child disclose the molest that were alleged in *John R.*, it may nevertheless support an estoppel when assessed in light of the circumstances under which it was uttered.

"Several circumstances are particularly important in this case. First, the directive not to tell was made by a teacher, a recognized authority figure, to an 11-year-old student. Students generally are expected to follow their teacher's directives. Second, the statement was made in conjunction with a sexual molestation. A common trait of 'child sexual abuse accommodation syndrome' is the child's failure to report, or delay in reporting the abuse. The very nature of the underlying tort deters the molested child from reporting the abuse. [Citations.] Thus, a molestation coupled with a directive not to report the incident may well deter a child from promptly reporting the abuse and thereby protecting his or her right to redress under the Tort Claims Act. Several courts have recognized the possibility that the perpetrator's directive to the victim not to report a sexual molestation may toll the statute of limitations. [Citations.]

"Accordingly, we conclude the circumstances presented by this case, if established, are sufficient to support an estoppel. A directive by an authority figure to a child not to tell anyone of the molestation is a sufficient inducement of delay to invoke an estoppel. Whether the District is estopped from asserting as a defense appellant's failure to comply with the claims statutes presents a question of fact for the trial court." (*Christopher P. v. Mojave Unified School Dist.*, *supra*, 19 Cal.App.4th at p. 173.) We remanded the case to the trial court "for a determination: (1) whether a directive or admonition not to tell was made in conjunction with the alleged molestation, (2) when the effect of the admonition coupled with the molestation ceased, and (3) whether the appellant acted within a reasonable time, not to exceed one year, after the delay-inducing effect of the molestation and directive ended. [Citation.]" (*Christopher P. v. Mojave Unified School Dist.*, *supra*, 19 Cal.App.4th at p. 173.)

III.  *Abuse of discretion in denying plaintiff's petition*

Before the trial court, the parties agreed that *John R.* and *Christopher P.* set forth the applicable test of equitable estoppel. Consistent with these authorities, plaintiff presented evidence, summarized above, to demonstrate that Diaz made ongoing threats in connection with his molestation of plaintiff. Further, plaintiff claimed the effect of these threats was still operating on him shortly before he filed his application to file a late claim with the District on July 19, 2002. The District did not directly refute plaintiff's evidence that Diaz's threats deterred plaintiff from bringing any legal action against Diaz. Until a combination of events occurred including confirmation that police were investigating Diaz for pedophilia, plaintiff's enrollment in a witness protection program, and plaintiff's receipt of psychological counseling, beginning on July 8, 2002 plaintiff continued to fear Diaz would deliver on his threats to ruin plaintiff's reputation. Instead, the District, in its briefing to the

trial court, attempted to distinguish *John R.* and *Christopher P.* principally on the basis that plaintiff was an adult when he filed his petition, arguing that "those cases involved a child in the ninth grade and an eleven-year-old as compared to a nineteen-year-old collegiate wrestler . . . ." The District makes similar arguments on appeal.

It is unclear to what extent the trial court was persuaded by the District's arguments. However, the fact that plaintiff was an adult when he first pursued his claim against the District appears to have been a central consideration in the court's ruling. To reiterate, the court's order mentioned four points in time at which estoppel might cease and stated, without explanation, that the evidence did not support extending estoppel beyond any of them: (1) plaintiff's departure from the District; (2) plaintiff's graduation from high school; (3) plaintiff's attainment of adulthood; and (4) plaintiff's termination of his relationship with Diaz.

■ On the basis of the record, we cannot conclude that the trial court properly exercised its discretion in denying relief on the grounds the evidence did not support application of equitable estoppel beyond the four events the court identified in its order. The court cited and we know no legal authorities holding that estoppel would *necessarily* be cut off upon any of these events. Nothing in *John R.* or *Christopher P.* suggests the test for estoppel depends on the victim's age. Rather, "[t]hese cases have the following in common: In each, the public entity or one of its agents engaged in some calculated conduct or made some representation or concealed facts which induced the plaintiff not to file a claim or bring an action within the statutory time; and in each, the plaintiff acted promptly, almost always within a year, after the public entity's conduct which caused the estoppel ceased." (*Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1047 [75 Cal.Rptr.2d 777].) The question of whether plaintiff acted within a reasonable time is measured from the time the deterrent effect of the unconscionable conduct of the District or its agent ceased. (See *ibid.*)

Plaintiff presented undisputed evidence of circumstances giving rise to estoppel which occurred after the events listed by the trial court. Plaintiff presented evidence that, after he departed junior high school and started high school in a different school district, Diaz continued to abuse him sexually and to threaten to humiliate him publicly if he ever disclosed the abuse by telling people plaintiff was gay and that he knew "people in high places" whom he could call upon to "take [plaintiff] down." The evidence showed that plaintiff believed Diaz's threats, which cunningly played off plaintiff's typical adolescent concerns relating to his popularity among his classmates. Diaz's threats also invoked his status as an authority figure who could command others to act. Plaintiff's fears were further reinforced by Diaz's apparent

ability to enlist others, including plaintiff's own parents, the high school "attendance lady," and plaintiff's classmates, to unwittingly aid Diaz in communicating his threats and ensuring his continued physical access to plaintiff.

Diaz continued to engage in similar calculating conduct after plaintiff graduated from high school. The evidence indicates that when plaintiff turned 18 and moved out on his own, Diaz actively pursued plaintiff, subjecting him to threatening telephone calls, finding out where he lived, and ingratiating himself with plaintiff's roommate in order to gain access to their apartment when plaintiff was absent. There is no indication Diaz's threats lost any of their efficacy after plaintiff became an adult or ended his relationship with Diaz. Rather, plaintiff presented evidence that he continued to be deterred by Diaz's threats. Plaintiff's emotionally charged disclosure of Diaz's abuse to his girlfriend in late 2001, rather than evidencing he was no longer afraid of Diaz as the District suggests, demonstrated that Diaz's threats were still acting strongly on him. Plaintiff became hysterical when his girlfriend suggested going to the police, specifically alluded to Diaz's past threats as a reason for not reporting the abuse, and threatened to kill himself.

The record supports a conclusion that Diaz's threats were still having a deterrent effect when he disclosed the abuse for the first time in late 2001. Moreover, plaintiff declared that it was not until after the police investigation of Diaz commenced, and plaintiff was enrolled in a witness protection program and received counseling from a psychotherapist, whom he met for the first time just 10 days before he filed his late-claim application with the District, that he felt he had reason to believe Diaz would not be able to follow through with his threats. At the hearing, plaintiff testified he sought legal advice for the first time after he met with the psychotherapist. These facts reflect that plaintiff acted within a reasonable time to pursue his claim against the District after the deterrent effect of the threats ceased. It is also significant that the District does not dispute that Diaz sexually abused plaintiff throughout the majority of his teenage years. According to the District's witness, Detective Armendariz, he was contacted in November 2001, after Diaz *admitted* to the school principal that he abused children. As we discussed in *Christopher P.*, a delay in reporting abuse under these circumstances is a common phenomenon. (See *Christopher P. v. Mojave Unified School Dist.*, *supra*, 19 Cal.App.4th at p. 173.) When the abuse is coupled with ongoing threats like in this case, this may be sufficient evidence to support an estoppel. (*Ibid.*)

Further, we are not persuaded by the District's attempts to distinguish *John R.* and *Christopher P.* For reasons discussed above, the fact that plaintiff was an adult when he first pursued his claim against the District did not preclude him

from invoking the doctrine of equitable estoppel. The District also makes much of the fact that plaintiff was not physically fearful of Diaz. There is no requirement that the abuser's threats must be physical in nature. Like the teacher in *John R.*, Diaz made threats to retaliate against plaintiff if he disclosed the abuse, including threats to represent to others that plaintiff was somehow responsible for instigating the relationship and that it was therefore plaintiff's fault, not Diaz's. Similarly, the District makes repeated reference to the fact that plaintiff was a wrestler and a college athlete, suggesting this is somehow relevant to the estoppel analysis. However, like the factor of age, strength, athletic ability, and educational status, by themselves, have no bearing on whether an abuser's threats have effectively deterred a victim from reporting the abuse or whether the deterrent effect of the threats have stopped. Adult athletes and college students are equally capable of being sexually abused and threatened as any other type of victim.

None of the other evidence relied on by the District establishes that plaintiff suddenly became impervious to Diaz's threats when he became an adult. The District asserts that plaintiff "continued to maintain" his relationship with Diaz into adulthood, pointing to evidence that Diaz cosigned plaintiff's car loan and plaintiff's testimony that he terminated his relationship with Diaz because he "just didn't want to do it anymore." The District infers from this that plaintiff was no longer afraid of Diaz and argues it was therefore unreasonable for plaintiff to wait two years after ending his relationship with Diaz to bring his request to file a late claim against the District. However, when analyzed in light of *all* the circumstances presented by the evidence, the District's inference is unreasonable. The evidence indicates that, far from becoming a consensual relationship when plaintiff reached adulthood, Diaz merely continued his pattern of manipulating plaintiff and inserting himself into plaintiff's life as he had when plaintiff was a minor. Although plaintiff ultimately ended the relationship, there was evidence the deterrent effect of Diaz's threats continued, more than a year later, when he first disclosed the abuse to his girlfriend. Plaintiff said that due to Diaz's threats and his fear of Diaz, he had planned to take the circumstances of the abuse with him "to his grave."

■ In sum, plaintiff demonstrated that he was entitled to relief from the claims-presentation requirements of the Tort Claims Act by presenting undisputed evidence supporting application of the doctrine of equitable estoppel beyond the four events identified by the trial court in its order denying relief. Because the correct test for estoppel and sufficient evidence to support each of the test's three prongs were presented for the court's consideration, there is no need to remand for further factual determinations as in

*John R.* and *Christopher P.* In the appropriate case, remand may be necessary. But based on the evidence in the record here it was an abuse of discretion for the court to reach the conclusion it did.[3]

## *DISPOSITION*

The judgment is reversed and the court is directed to grant plaintiff's petition under section 946.6 for relief from the claims-presentation requirements. Plaintiff is awarded his costs on appeal.

Harris, Acting P. J., and Gomes, J., concurred.

Respondent's petition for review by the Supreme Court was denied May 10, 2006, S142020. George, C. J., did not participate therein.

---

[3] In light of our holding, we do not address plaintiff's contention concerning the court's failure to consider or to grant relief based on the declarations of plaintiff's psychotherapist or plaintiff's contention that the generous limitations periods for childhood sexual abuse victims embodied in recent statutory amendments to Penal Code section 803, subdivision (g), and Code of Civil Procedure section 340.1 militate in favor of granting relief in this case.